**OVERSEAS MAILMAN, INC., Plaintiff,**
v.
**UNITED STATES of America, Defendant.**
Civ. A. No. 1066–66.
United States District Court,
D. New Jersey.
Feb. 1, 1971.

Max L. Rosenstein, Newark, N. J., for plaintiff; Seymour Kehlmann, of Blum, Haimoff, Gersen, Lipson & Szabad, New York City, of counsel.

Robert Hipple, Atty. Tax Division, Department of Justice, Washington, D. C., for defendant.

## OPINION

AUGELLI, Chief Judge:

Plaintiff seeks in this action to recover $29,567.19 paid by it to defendant as retailers' excise taxes for the years 1959 through 1964 and as delinquency return payments and interest relating to those taxes, together with statutory interest on any amounts found to be overpayment. By stipulation, defendant has conceded that plaintiff has exhausted its administrative remedies and that this suit for refund was timely filed. The Court's

jurisdiction is invoked under 28 U.S.C. § 1346(a). The matter has been submitted to the Court on cross-motions for summary judgment. The basic facts have been stipulated. Following oral argument, decision was reserved.

The facts may be briefly summarized. The plaintiff, Overseas Mailman, Inc. (Overseas), is a New Jersey corporation, with its principal place of business in New Jersey, engaged in the business of offering promotional schemes to various domestic commercial businesses to be used by them in connection with the sale of their products. Overseas would establish connections with various foreign manufacturers of premium or gift items such as Italian Ceramic Ashtrays, Yugoslavian Dolls, German Black Forest Clocks, Cuckoo Clocks, and numerous other items. It would then contact American manufacturers and offer them such gift or premium items to be used as promotional schemes in connection with the sale of such manufacturers' usual products. Agreements were reached with the manufacturers, copies of which are attached to and made part of the stipulation. Typically, the American manufacturer would include a coupon with its own product, offering its customer an opportunity to purchase the foreign premium items. The present case involves the sale of certain German Black Forest Clocks and Cuckoo Clocks, items which both parties to the suit agree are included in the list of items taxable under Section 4001 of the Internal Revenue Code of 1954, 26 U.S.C. § 4001.

In the promotional scheme, the retail consumer sent the accompanying coupon with a stated consideration to a Post Office Box maintained under the exclusive control of Overseas in Palisades Park, New Jersey. The address on the coupon for the post office box generally included the word "clock" in conjunction with some part of the name of the commercial business from which the purchaser obtained his coupon. There was no indication on such coupon that Overseas was involved in the transaction.

Upon receipt of the coupon and proper payment from the consumer, Overseas, pursuant to its prior agreement with Franz Grieshaber, a German clock manufacturer, forwarded an addressed mailing label to him in Germany with a fixed payment for each clock ordered, which included postage and handling. The difference between each consumer's payment in the amount forwarded for the clock was retained by Overseas.

Throughout the period from 1959 to 1964, the individual contracts between Overseas and the American manufacturers that were made part of the stipulation indicate that the price of the clocks to the consumer differed from time to time, and the amount of money paid by Overseas to Grieshaber likewise varied during this period. Overseas explained that these changes reflected the increased costs of manufacturing, handling and shipping charges. On receipt of the address label and the agreed upon consideration, Grieshaber shipped the clocks directly to the purchaser.

The only obligation of the American manufacturers involved in these promotional schemes was to design, print and distribute the coupons and other advertising materials employed, and to forward to Overseas any communications received relating to the operation. These manufacturers entered into no direct agreements with Franz Grieshaber, except with respect to some of the contracts between Overseas and the manufacturers, Grieshaber would signify his consent to the terms of the contract by signing a copy.

The written agreement which Overseas entered into with each of the manufacturers who agreed to this clock promotional scheme generally obligated Overseas:

(1) to warrant that Franz Grieshaber would have a certain quantity of German clocks available for shipment to the United States and that these clocks be of the same quality as a sample shown to said manufacturers;

(2) to open and process all orders within a reasonable time; to type on

triplicate labels the name and address of each purchaser (sending one to Franz Grieshaber for use in mailing clocks to the purchaser, placing one on a postcard acknowledgment to the purchaser, and retaining one in the Overseas files), and to keep accurate records of all transactions;

(3) to assume all financial responsibility for transactions between purchasers and Overseas;

(4) to refund the full clock purchase price to any dissatisfied purchaser;

(5) to refund any import duty, tax or handling charges collected from any clock purchaser;

(6) to maintain product insurance against liabilities arising from personal injury or property damages caused by the clocks;

(7) to assure that all German clocks would be securely packaged and properly stamped in Germany;

(8) to assure that Grieshaber would, on receipt of the addressed mailing label and payment, promptly mail the clock to each purchaser in the United States; and

(9) to accept from purchasers a given price in full payment for each German clock, including postage and handling costs.

Although there was no detailed written agreement between Overseas and Grieshaber, a letter dated December 28, 1958, written by Grieshaber to Overseas spells out the essential terms of an agreement. This letter establishes the basic scheme whereby Overseas would send Grieshaber 76 cents to cover the cost of the clock, including postage and handling; however, there are inconsistencies within the letter which make it uncertain whether Overseas was acting as a sales agent for Grieshaber or whether it was purchasing each clock for resale. Thus, the Court is called upon to decide the question which this letter leaves unclear.

The Internal Revenue Service concluded that Overseas was selling the clocks at retail, and therefore subject to the retailers' excise tax prescribed by Section 4001 of the 1954 Internal Revenue Code, 26 U.S.C. § 4001, for the years 1959 through 1964. This particular tax was repealed on June 21, 1965. In pertinent part, the statute, while in force, read:

"There is hereby imposed upon the following articles sold at retail a tax equivalent to 10 percent of the price for which so sold:

\* \* \* \* \* \*

Clocks."

The parties agree that unless three statutorily required conditions existed in connection with Overseas' operation, the tax was improperly levied against it. This requires a determination as to: (1) whether the sale of Black Forest Clocks and Cuckoo Clocks were sales at retail within the meaning of Section 4001 of the Internal Revenue Code of 1954, as amended; (2) if so, were these "sales at retail" made by Overseas; and (3) if so, did such "sales at retail" take place within the United States. If the answer to each of the three questions is in the affirmative, defendant would be entitled to a summary judgment in its favor; otherwise, Overseas would be entitled to a judgment in its favor and a refund with statutorily accrued interest of the retail excise taxes and penalties it paid for the period in question. Consideration will now be given to each of the three questions in their listed order.

(1) Were the individual sales of Black Forest Clocks and Cuckoo Clocks to American consumers, sales at retail within the meaning of Section 4001 of the Internal Revenue Code of 1954, as amended?

The term "sold at retail" for the purposes of a retail excise tax has never been clearly defined by Congress. Courts have construed the meaning of this term on a case by case basis. Such interpretation has not been entirely uniform. In Torti v. United States, 249 F.2d 623 (7 Cir. 1957) and Gellman v. United States, 235 F.2d 87 (8 Cir. 1956),

it was held that a retail sale is a sale to the ultimate consumer for his own personal consumption and without a further consumer profit motive. The Court of Claims, however, defined "sold at retail" for the purposes of levying the excise tax to be a sale which is made for a purpose other than resale by the purchasers. Worrell's, Ltd. v. United States, 301 F.2d 317, 157 Ct.Cl. 297 (1962).

In the course of reaching its decision, the Court of Claims considered the genesis of 26 U.S.C. § 4001:·

"The excise tax as imposed on * * [clocks] under the Revenue Act of 1932, 47 Stat. 169 et seq., § 605, was imposed at the level of sale of * * [clocks] by the manufacturer, producer, or importer. The tax continued as imposed at that level until the Revenue Act of 1941, 55 Stat. 687 et seq., § 552(a), placed the excise tax on * * [clocks] at the level of retail sale. The major purpose of that act was to increase the national revenues to meet the radical increase in government expenditures for national defense in 1941. (House Report No. 1040, 77th Cong., 1st Sess., 1941—2 Cum. Bull. 413). The same House Report indicates that the alteration of the level of taxation on * * * [clocks] from manufacturer's to retailer's sale would net the Government annually $56,200,000 in additional revenue. Id. at 415. From this it may be inferred that the legislature did not intend any diminution of the base of the excise tax when it changed the level from manufacturer's to retailer's sale. * * *

"The obvious conclusion dictated by this analysis is that the phrase 'sold at retail' was intended to indicate *when* in the course of its marketing cycle * * * [clocks] would be taxed." Worrell's Ltd. v. United States, 301 F.2d 317, at pp. 318–319, 157 Ct. Cl. 297 (1962).

That legislative background and analysis is helpful in resolving the issues posed in this case.

█ It is undisputed here that the consumers who purchased the clocks through this promotional scheme did so for their own personal use and not for the purpose of resale or further consumer profit. Thus, the tests for "sold at retail" laid down in Gellman, supra; Torti, supra; and Worrell's, Ltd., supra, are all met. Somewhere in the chain of events a sale at retail was made to the consumer. "Sold at retail", this Court finds, was intended by Congress to indicate the point in time when the tax should accrue. That point in time can only be determined by an evaluation of all the facts in a given case, and what the parties intended by their transaction. The critical question, then, is whether Overseas was the party in the chain of events who made the sale at retail to the domestic consumer.

(2) Were these sales at retail made by Overseas?

█ Having concluded that a retail sale was made to the domestic consumers, the Court must determine which of the several parties that took part in this scheme sold the clocks to the consumers. The three parties involved in the promotional sale of the clocks were the domestic manufacturer who incorporated the coupon offering the clocks in its own products advertising, Overseas, and Franz Grieshaber. Logically, one of the three parties had to sell at retail the clocks to the domestic consumers.

With respect to the position of the domestic manufacturer in this promotional scheme, the Court is of the opinion that the American manufacturer did not make sales at retail within the meaning of 26 U.S.C. § 4001. By their agreement with Overseas, the domestic manufacturers were required only to print coupons to order the clocks in question and enclose them in their own products' advertising so that the purchaser of the manufacturers' products would have the opportunity to purchase the premium item. They incurred no expenses other than the costs of the coupons and advertisements, and gained no direct profits from the sale of the clocks other than

the benefit of increased sales of their own product if the promotion was successful. The manufacturers by contract had Overseas assume all financial responsibility for the transactions involved in this case. In addition, the domestic manufacturers had no contact with Grieshaber except that the German manufacturer signified his consent to some of the agreements between the domestic manufacturers and Overseas by signing some of the agreements. Thus, the part which the American manufacturers took in their promotional scheme was so limited that they can not be held to have sold the clocks in question at retail to the domestic consumers.

Whether Overseas or Franz Grieshaber, the two remaining possibilities, was the retail seller, the respective positions of Overseas and defendant should first be spelled out. Overseas contends that it was a sales agent for the foreign manufacturer, Franz Grieshaber. As such, Overseas claims that it merely arranged for Grieshaber to sell his products through this promotional scheme, receiving for the services it performed a commission and an expense allowance. Since Grieshaber was a foreign manufacturer, Overseas asserts that in order to get domestic manufacturers interested in this promotional scheme, it had to assume certain obligations and duties in conjunction with the sales operation. These extra duties, Overseas believes, do not change the operation from one of a sales agent to one of a retail seller. Further, Overseas takes the position that it could never have sold the clocks to the domestic consumer because it never had title to clocks as they were shipped directly by Grieshaber to the domestic purchaser, thus precluding the repose of title in Overseas at any time.

The Internal Revenue Service took the contrary position and asserted that Overseas was the real seller of the clocks, and therefore liable for the excise tax. Defendant argues that there were two separate sales transactions involved in every consumer purchase. One of the sales transactions, though not necessarily the first in time, was the sale of the clocks from Grieshaber to Overseas. That transaction entailed having Grieshaber pack and ship the clock to the consumer directly from Germany, rather than having Overseas incur the added expense of receiving the shipment itself and then remailing the clock to the purchaser. The second sales transaction was between Overseas and the consumer. This transaction was initiated when the consumer sent a coupon to Overseas' post office box in Palisades Park, New Jersey.

To determine whether Overseas or Grieshaber was the retail seller in this promotional scheme, a review of the origins of this transaction is in order. Overseas was the party who devised this promotional scheme and placed all the pieces together. In 1958 Overseas and Grieshaber reached an agreement to conduct this type of promotional scheme. The only written evidence of such agreement was a letter dated December 28, 1958 from Grieshaber to Overseas, confirming said agreement. This letter, as translated, reads as follows:

"Dear Sir:

We confirm herewith that you are according to our agreements our Sales Agent for the United States.

You will receive on all orders a commission in the amount of 5%.

At the sale time we confirm that you have to pay for our Jockelclock No. 0405 $0.76 this includes special packing and postage.

This price is understood after payment of 15% for your expenses and your commission.

Franz Grieshaber"

Although this letter specifically states that Overseas was to be Grieshaber's sales agent, the internal inconsistencies within the letter permits the Court to look beyond the language used to determine the true nature of the transaction. Boardman Co. v. Board of Commissioners of Pontotoc County, Oklahoma, 116 F.2d 249 (10 Cir. 1940);

Minthorne v. Seeburg Corporation, 397 F.2d 237 (9 Cir. 1968); Arnold Productions, Inc. v. Favorite Films Corporation, 298 F.2d 540 (2 Cir. 1962). While the first paragraph of the letter specifically purports to create a sales agency, the third paragraph, standing alone, casts some doubt upon that alleged sales agency. Said paragraph by itself could be taken to imply that Overseas intended to purchase the clocks from the manufacturer at 76 cents for purposes of resale. This notion is reinforced because of the ambiguity of the commission arrangement discussed in the letter. The second paragraph states that Overseas was to receive a 5% commission on each sale. The fourth paragraph then reads that Overseas was to receive 15% for expenses and commissions. However, despite the figures mentioned in the letter, Overseas was originally receiving $1.00 from the domestic consumer and remitting 76 cents to Grieshaber for each clock; thus, Overseas was retaining 24 cents for expenses and commissions. The internal inconsistencies within the letter and the disparity between the amount retained by Overseas and the amount proposed in the letter certainly casts doubt upon the validity of the sales agency assertion contained therein.

Overseas' argument that it was not a retail seller and that it merely established a commission procedure, and helped administer that operation whereby Grieshaber could sell his goods in the United States, is buttressed by the fact that on the coupon used by the consumer to purchase a clock, there was no indication that Overseas was in any way involved in the transaction. Its name never appeared upon the face of the coupon. In addition, the coupon stated that the orders would be accepted in Europe and mailed directly to the purchaser from Germany. It is significant that Grieshaber did, on occasion, refuse to fill an order after an address label and the stated consideration were sent to him. This was done when Grieshaber received too few orders to make it financially feasible to manufacture that specific clock. Grieshaber's right of acceptance or refusal would indicate that the German manufacturer, and not Overseas, was dealing directly with the consumer.

On the other hand, however, there were many actions taken by Overseas which would be more consistent with those of a retail seller than that of a sales agent for Franz Grieshaber. Overseas, as part of its agreement with the various domestic manufacturers and producers, maintained the post office address to which the coupons were mailed, processed all orders which were sent to that address, warranted that Grieshaber would have a certain quantity of clocks and that those clocks would be a certain minimum quality, kept accurate records, assumed all the financial responsibilities for the transaction, agreed to refund the full clock purchase price to any dissatisfied retail purchaser, agreed to refund any import duty, tax or handling charge collected from any retail purchaser, and maintained product liability insurance. In addition, Overseas kept the difference between the consumer price and Grieshaber's price irrespective of the 5% commission figure ostensibly agreed to in the December 28, 1958 letter. This would indicate that Overseas retained the greatest possible profit through the sale of the clocks.

This Court agrees with Overseas that it had to give extensive assurances and services in light of Grieshaber's status as a foreign manufacturer. A domestic manufacturer would understandably be hesitant to accept the promotional scheme unless they received certain assurances from a domestic company. Despite the reasonable need for these extensive services and assurances, when the same are viewed in conjunction with the questionable commission arrangement, they cast doubt upon whether a sales agency did, in fact, exist between Overseas and Franz Grieshaber.

To decide the question of whether Overseas or Grieshaber was selling the clocks at retail to the consumer, an ex-

amination of an analogous case is in order. In Around the World Shoppers Club v. United States, 198 F.Supp. 773 (D.N.J.1961), aff'd 309 F.2d 324 (3 Cir. 1962), plaintiff Around the World Shoppers Club (Club), was seeking recovery of a certain amount of federal excise taxes paid pursuant to 26 U.S.C. § 4001. Club solicited membership in its organization by advertisements in newspapers and magazines. It then entered into a contract with those interested members of the general public, by the terms of which a member was entitled to receive, for each month of the period of his membership, an item of merchandise manufactured in a foreign country to be shipped directly to the member from abroad. Negotiations were then entered into by Club with the foreign manufacturers for the merchandise items which were to be shipped to Club members. These negotiations resulted in the entry by Club into a formal contract with each manufacturer setting forth the price to be charged by the manufacturer to the Club, and the quantity and mode of shipment of the merchandise. The Court decided that Club was a retail seller within the meaning of 26 U.S.C. § 4001, and found that two separate sales agreements and transactions had taken place. By acceptance of an application for membership and the retention of the accompanying fee, a contract for the sale of future goods had arisen between Club, as seller, and the applicant for membership, as buyer. It was stated that the subsequent agreement between Club and the foreign manufacturers was a supply contract, which enabled the Club to perform its contractual obligations with its members. On this basis, the Court ruled that Club purchased the products from the foreign manufacturers at wholesale and re-sold them to the domestic consumers at retail. Therefore, Club was liable for the excise tax.

Although the consumer in the present case had no explicit knowledge of Overseas' involvement in the purchase of the clock, a helpful analogy can be drawn from Around the World Shoppers Club.

As the Club did in that case, so here Overseas contracted with foreign manufacturers, in this case Franz Grieshaber, and came to an understanding with respect to quantity, quality, price and conditions of sale of clocks. The promotional scheme established to sell these clocks, although not mentioning Overseas specifically, did involve Overseas in as integral a role as the Club was involved in, in Around the World Shoppers Club.

A domestic consumer could take advantage of the scheme by filling out a coupon and sending a remittance to a post office box under the exclusive control of Overseas. Although some of the coupons stated that the orders would be accepted in Europe and the clocks would be mailed from Europe, this Court interprets the clause concerning European acceptance to mean that if sufficient quantities of clocks were available to fill the coupon request, it would be filled. That clause in view of the entire method of operation can not be interpreted to mean that title passed in Europe. Rather it indicates that one further step had to occur after receipt of the coupon request by Overseas in filling the order. Overseas relies heavily on the fact that Grieshaber did, on a few occasions, reject the filling of an order because the number of requests were too few to make it financially remunerative to manufacture the clocks requested. This argument, however, must be weighed against the fact that only on rare occasions were any orders rejected and that Grieshaber neither received nor handled the original coupon or remittance and was not financially responsible for any aspect of the transaction. The situation here is analogous to that of Around the World Shoppers in that the Club would contract for a large quantity of goods for shipment to consumers in the United States monthly. As long as Overseas would order large quantities of particular clocks, Grieshaber could meet the requests.

This Court is of the opinion that two transactions occurred during this promotional scheme. The first was the

agreement between Overseas and Grieshaber to sell clocks at a certain price. The clauses in the only written memorandum produced in this case to evidence that agreement, which states that Overseas was merely a sales agent, are contradicted by not only internal inconsistencies but also the external facts. This whole scheme was designed and pieced together by Overseas, not to act as a sales agent for a German clock manufacturer, but rather to sell whatever products it could pursuant to the scheme devised. Overseas acted analogously to Club except that there was no explicit knowledge on the part of the consumers of its role in the transaction. This lack of knowledge, in light of all the circumstances, is not sufficient to justify the conclusion that Overseas was not a retail seller within the meaning of 26 U.S.C. § 4001.

(3) Did these sales at retail take place within the United States?

■ Having concluded that two sales took place during this promotional scheme, the third question which must be answered affirmatively to decide in favor of the defendant can be disposed of readily. This Court is of the opinion that when Overseas received in the post office box which it exclusively controlled, the coupon order and began processing it, a sale occurred. It is this sale that is a sale at retail and taxable under 26 U.S.C. § 4001. The fact that Grieshaber mailed the clocks directly to the consumer does not militate against this conclusion. Overseas by this arrangement was saving itself the expense and time of reshipping the goods once they reached the United States. Even the fact that Grieshaber rejected on occasion some orders does not change the situation. In these cases the sale which took place was later rescinded by Overseas, and the consumer received his purchase money back.

As earlier described in the legislative history quoted from Worrell's, Ltd., supra, the intent of Congress was to expand the base of the excise tax rather than contract it. This is noteworthy because if the tax still fell upon the manufacturer, there probably could not have been an excise tax in this case. The clocks in question were manufactured in Germany and imported into the United States directly to the consumer. But 26 U.S.C. § 4001 changed the tax to one on retail sales. Since this Court has found a retail transaction between the consumer and Overseas for the purchase of clocks manufactured by Grieshaber, a tax pursuant to 26 U.S.C. § 4001 was properly levied.

For the reasons stated herein, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment granted. No costs.

Counsel for defendant, on notice to counsel for plaintiff, will please submit an appropriate order.